Appeal of CUMMINGS and McINTYRE From an Order of the Corporation Commission of the State of Oklahoma.

CUMMINGS and McINTYRE, Appellants,

v.

CORPORATION COMMISSION OF OKLAHOMA, Appellee.

No. 37654.

Supreme Court of Oklahoma.

Dec. 17, 1957.

Robinson, Shipp, Robertson & Barnes, by T. Murray Robinson, Oklahoma City, for appellants.

Floyd Green, Conservation Atty., Ferrill Rogers, Asst. Conservation Atty., Corp. Commission of Oklahoma, Oklahoma City, for appellee.

WILLIAMS, Justice.

This is an appeal from an order of the Corporation Commission denying Cummings and McIntyre, hereinafter referred to as applicants, permission to dispose of salt water underground through their No. 1 Johnston well in the East Pond Creek Pool in Grant County, Oklahoma.

Applicants are the owners of three Wilcox wells in the small East Pond Creek Pool in Grant County, Oklahoma. There is produced from these wells a total of around 280 barrels of salt water per day. For some time prior to the passage of the Deleterious Substances Act of 1955, 52 O.S.Supp.1957 § 139 et seq., which vested control of such matters in the Corporation Commission, applicants had been disposing of such salt water in the same manner that permission so to do was herein sought and denied, that is, by injecting the same into the annulus of their No. 1 Johnston well. Some time after passage of the Deleterious Substances Act of 1955, above referred to, applicants filed an application before the Commission for authority to so dispose of the salt water underground. Although notice was given as required by law, no one appeared to protest or object to the granting of the application, but after a hearing upon the same, the Commission denied the application and applicants have perfected this appeal.

As their propositions of error, applicants contend that the order denying the application is unsupported by any finding of fact which would require or suggest that the application be denied, and that the action of the Commission in denying the application was wholly arbitrary and therefore unlawful.

The authority of the Corporation Commission in matters of the kind here involved arises by virtue of the provisions of 52 O.S.1951 § 86.2, which defines and prohibits the waste of oil and charges the Commission with the duty to make rules, regulations and orders, for the prevention of such waste, and for the protection of all fresh water strata and oil or gas bearing strata encountered in any well drilled for oil or gas, and the provisions of 52 O.S. Supp.1957 § 139, which vests the Commission with authority to make and enforce such rules, regulations and orders governing and regulating the handling, storage and disposition of salt water, mineral brines, waste oil and other deleterious substances produced from or obtained or used in connection with the drilling, development, producing, refining and processing of oil and gas products within the State of Oklahoma or operation of oil or gas wells in this state as are reasonable and necessary for the purpose of preventing the pollution of the surface and sub-surface waters in the state. The only rule or regulation issued by the commission pursuant to the authority granted by either of the foregoing statutes that has been called to our attention is rule 505 promulgated in general order number 19334, which reads as follows:

"Underground disposal of water.— The underground disposal of salt water, or other water, unfit for domestic, livestock, irrigation or other general uses, is permitted only upon hearing and by order of the commission.

"Disposal wells shall be cased and the casing cemented in such manner that damage will not be caused to oil, gas, fresh water or other resources."

Other laws affecting the disposal of salt water which should be noticed at this point are 29 O.S.1951 § 409, 52 O.S.1951 § 296, and 82 O.S.1951 § 901. These statutes impose upon applicants the duty to safely dispose of the salt water produced from their wells, and impose certain restrictions thereon, and criminal as well as civil liabilities for the non-observance thereof. By virtue of these last mentioned statutes, applicants are prohibited from allowing the salt water to flow over the surface of the land and from disposing of the same in any stream, lake or pond, or in any place where the same will run or be washed into such stream, lake or pond. Thus it may be seen that as a result of all the above mentioned laws and rules, the applicants are placed under a mandatory duty to safely dispose of the salt water produced by their wells but are greatly limited as to the manner in which such disposal may be effected.

As a practical matter, only two alternatives are available to applicants as to the manner of disposing of the salt water. One alternative is the so-called pit method of evaporation of salt water, which involves the construction of earthen storage tanks or ponds in which the salt water is stored until such time as it evaporates or seeps into the ground below. The other alternative is to dispose of the salt water underground, which is done by gathering the salt water into tanks and then piping it to a well through which it is then injected into some subterranean stratum. Some comment on the comparative merits of these two methods of salt water disposal may be found in the opinion in Crosbie v. King, 192 Okl. 53, 133 P.2d 543, 545, in which the court said:

"As to the contention that the method of disposal adopted is too expensive, and is not the least economical, there is some comparative evidence. It must be recognized that the so-called pit method of evaporation has long been in use, and when the cost of this method is limited to the expense of digging the pit and the expense of evaporating the water it is a relatively inexpensive method. That it is not a safe method is attested by the many laws suits that have arisen and still arise from pollution occasioned when these pits are overflowed, or are overflowed by rain water, or the dike breaks or water is lost by seepage or other apparently unavoidable incidents. There is scarcely a more fruitful source of litigation, as is disclosed by the docket and decisions of this Court. When this item of cost, which is not a speculative matter, is taken into account the pit method may not be so inexpensive. Crosbie contends the most economical method of disposal is to turn the salt water on to the ground or into water courses and take the chance on minimizing the recovery in the resulting damage actions. This last method is, of course, against the law, and is not to be contemplated nor tolerated, and we must keep in view legal methods of disposal, and all of these are costly. The adoption of any legal method is a matter of judgment, and this leads us to say that the disposal method now being used by Crosbie cannot be condemned as being utterly impractical. This method consists of gathering salt water, piping it to a well and there pumping it into some subterranean strata. Several of the larger companies in the industry are using this method in the Fitts Field and in other states, where facilities permit."

With such background in mind, we now consider the order appealed from, and applicant's contention that the same is unsupported by any finding of fact which

would require or suggest the denial of the application and that the same is arbitrary and unreasonable.

We first notice that although the Commission made findings of fact, such findings, after the necessary jurisdictional recitals, cover only matters concerning which there is no controversy, and which for the most part are immaterial to the question presented. The Commission made no finding that the disposal of salt water underground through the No. 1 Johnston well had caused, would cause, or was reasonably likely to cause any pollution of surface or sub-surface waters or any damage to any oil or gas bearing stratum. Furthermore, there was no evidence upon which such a finding could have been based, all of the evidence being to the contrary. The uncontradicted evidence established that the only fresh water zones or strata in the area involved were located some 20 to 40 feet beneath the surface and that there were no fresh water zones or strata at any greater depth, and that all oil or gas bearing strata were located at a depth greater than 4,200 feet. When the Johnston No. 1 well was drilled, a 13 inch hole was first drilled to a depth of some 300 feet, and 290 feet of 10¾ inch casing, known as surface casing, was then set therein and cemented from top to bottom, some 250 sacks of cement being used to completely fill the void surrounding the surface casing. Operations were thereafter conducted through such surface casing, in order that drilling muds and other substances which might be in said well during drilling operations could not enter the fresh water zones behind such surface casing. A hole approximately 9 inches in diameter was then drilled from the bottom of the surface casing on down to a depth of some 5,956 feet, at which depth oil was encountered and is being produced from the Wilcox sand. There was then set what is commonly called the producing string of casing, which is a string of pipe 7 inches in diameter set inside of the surface casing and extending to the bottom of the hole. Cement was then forced through such producing casing and up behind that pipe to a height of some 4,200 feet below the surface of the ground. Because of this segment or area of cement surrounding the producing casing from a depth of some 4,200 feet on down to the bottom at some 5,956 feet, nothing could come down behind the producing string and entering the producing formation, and that which was in the producing formation could only be removed through the producing string of casing.

The salt water is disposed of by inserting it in the annulus of this well, which is the space between the surface casing and the producing casing. The water so injected must, of course, travel on down through the surface casing and then continue in the open hole until it finds a zone of such high permeability that it will enter therein. As indicated by all the evidence in this case, it cannot return to the fresh water strata near the surface by reason of the cement behind the surface casing, and it cannot penetrate to the area of the oil and gas zone by reason of the cement behind the producing string. The uncontradicted evidence established that the sub-surface structure through which the well was drilled in the zone running from the bottom of the surface casing on down to a depth of 600 feet consisted of Hennessey Red Shale, which is a hard closely packed structure having no porosity or permeability; that the structure from a depth of about 600 feet on down to a depth of about 1,300 feet below the surface consisted of an anhydrite zone, which is a highly porous and permeable structure, capable of taking and holding large quantities of water. Surveys and tests were made, and the results thereof introduced in evidence, which indicated conclusively that the salt water injected into the annulus of this well was actually travelling down the hole and entering the anhydrite formation at some point not less than 800 feet and not more than 970 feet below the surface. All of the testimony was that all of the salt water injected into the annulus of this well entered and remained in the 700 foot to

1,000 foot anhydrite zone which was barren of fresh water or oil or gas.

The Commission called two witnesses, the assistant director of its oil and gas conservation department, and the assistant conservation officer in charge of pollution, who opposed the granting of the application. Neither of these witnesses testified, however, that the disposal of salt water underground through the No. 1 Johnston well had caused, would cause, or was reasonably likely to cause any pollution of surface or sub-surface waters or any damage to any of the oil or gas bearing strata. Both apparently opposed the granting of the application as a matter of policy only. The assistant director of the oil and gas conservation department testified that they had no objection to the present operation of applicants in disposing of their salt water as long as that set of conditions continued; that the disposal of the salt water in the anhydrite zone was satisfactory; that there was no danger of any damage to any oil and gas producing strata; that so long as the water level in the hole was down around 900 feet below the surface and the salt water was gravitating down the hole and into the anhydrite zone at such depth he would have no fear that there would be any pollution of the surface or sub-surface fresh water strata; that the only danger of pollution to the fresh water sands would occur if the surface casing should erode and allow the salt water to escape into some fresh water sand. When asked how this might occur, he testified in effect that if the cement placed around the surface casing had not completely filled the void around the upper part of the surface casing, and if erosion should take place on the same part of the surface casing, and if the salt water were placed in the hole under pressure, there would be a possibility that some pollution of the fresh water sands would occur. The witness admitted, however, that exactly the same possibility of such pollution would be present in a separate well drilled and used exclusively for the disposition of salt water, to which his department would apparently have no ob-

jection. In view of the positive and uncontradicted evidence that the salt water in question was injected through a closed system, that is, it was gathered in closed tanks and piped to the annulus of the well without being aerated, which greatly reduces, if not completely eliminates, the possibility of corrosion, and that the salt water was being flowed down the annulus by the force of gravity and not under pressure, and would continue its course even though there was a corroded pipe at its side, and that such surface pipe was completely surrounded by cement through which the salt water could not penetrate even if the surface casing did corrode, we are of the opinion that the only possibility of pollution suggested by the assistant director is so remote, nominal, and speculative, that it does not constitute substantial evidence of any probability of pollution of the fresh water strata.

The Commission's other witness, the assistant conservation officer, simply testified that he did not consider it a good practice to dispose of salt water in the manner proposed because, "well the reason why I state it, from what I've heard of this testimony is that you can't tell where this water is going", but that he didn't want to testify from any technical standpoint and that that was just his opinion and that he was not testifying.

Under Article 9, Sec. 20, Constitution of Oklahoma, as amended, this court is now obliged on appeals from the Corporation Commission not involving constitutional issues to determine whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Pannell v. Farmers' Union Co-Op Gin Ass'n, 192 Okl. 652, 138 P.2d 817.

As we construe the evidence in its entirety, we are unable to find substantial evidence justifying the necessary finding of the Commission that the disposal of salt water underground through the No. 1 Johnston well has caused, will cause, or is reasonably likely to cause any pollution of surface or sub-surface waters or any damage to any of the oil or gas bearing strata.

The Commission in fact made no such finding. The conclusion that the application should be denied is therefore not supported by either a necessary finding of fact or substantial evidence, and is therefore arbitrary and unreasonable and should be and is hereby reversed.

CORN, V. C. J., and HALLEY, JOHNSON, BLACKBIRD and JACKSON, JJ., concur.

WELCH, C. J., and DAVISON, J., dissent.